UNITED STATES of America ex rel. Brett ROBY, Plaintiff,

v.

THE BOEING COMPANY, Defendant.

No. C–1–95–375.

United States District Court, S.D. Ohio, Western Division.

Dec. 30, 1999.

---

Ann Louise Lugbill, Manley Burke Lipton & Cook, Cincinnati, OH, James Bur-dette Helmer, Jr., Helmer Martins & Morgan, Cincinnati, OH, David Phillip, James Edward Wimberley, Michael A. Havard, Provost & Umphrey, Beaumont, TX, Charles V. Firth, Reuben A. Guttman, Daniel J. Guttman, Provost & Umphrey, Washington, DC, for Brett Roby.

Michael S. Child, U.S. Dept. of Justice, Washington, DC, for U.S.

Jerome Charles Randolph, Keating, Muething & Klekamp, Cincinnati, OH, Curtrice M. White, Todd W. Rosencrans, Steve Y. Koh, Steven S. Bell, Mark H. Lough, Gary DiBiance, Perkins Coie, Seattle, WA, Mitchell S. Ettinger, Bonnie J. Austin, Martin T. Moe, Edward J. Meehan, Raina E. Burbaker, Jennifer L. Spaziano, Caprice L. Roberts, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC, for Boeing Co. and Speco Corp.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendant's Cross–Motion for Partial Summary Judgment as to the Measure of Damages (doc. 340); Government's Response (doc. 366); Relator's Response and Cross–Motion for Summary Judgment as to the Measure of Damages (doc. 367); Defendant's Reply (doc. 401); Aerospace Industries of America, Inc's Motion in Support of Defendant's Cross–Motion as to the Measure of Damages (doc. 402); Relator's Reply (doc. 432); and Defendant's Motion Requesting the Court to Rule on Defendant's Cross–Motion for Partial Summary Judgment as to the Measure of Damages (doc. 556).

## BACKGROUND

On May 22, 1995, Relator Brett Roby (hereinafter, "Relator") filed this action under seal pursuant to Title 31 U.S.C. § 3730(b) on behalf of himself and the United States Government (hereinafter, "the Government" or "the United States") in the United States District Court for the Southern District of Ohio (doc. 2). Relator

alleges that The Boeing Company (hereinafter, "Boeing" or "Defendant") and its supplier, The Speco Corporation (hereinafter, "Speco"),[1] violated the False Claims Act, Title 31 U.S.C. § 3729, *et seq.*, by manufacturing and selling defective transmission gears to the United States via Boeing's CH–47(D) Chinook Army helicopters[2] (hereinafter, "CH–47(D) helicopters") (*Id.*). On April 30, 1997, the Government intervened and filed an Amended Complaint against Boeing (doc. 34). In the Amended Complaint, the Government alleges that Speco manufactured defective, transmission gears at its Springfield, Ohio facility before Boeing installed the gears in the CH–47(D) helicopters, and, thereafter, supplied the gears to the United States Army (*Id.*). The Amended Complaint was unsealed on May 1, 1997.

Government and Relator allege in Count I of the Amended Complaint that Defendant submitted false claims under Title 31 U.S.C. § 3729–3133, as amended by Pub.L. 99–562, 100 Stat. 3153 (1986) (doc. 34). Specifically, the Government contends that in 1991, one of the Speco-made gears failed in flight, while in service in Saudi Arabia, leading to the total loss of a CH–47(D) helicopter and all of its contents, at an estimated loss of approximately $10 Mil-

lion (*Id.*).[3] In addition, the Government alleges that in 1993 another Speco-made gear failed in another helicopter incident resulting in a hard landing near Ft. Meade, Maryland,[4] causing approximately $1 million in damage to that helicopter (*Id.*).[5] Relator alleges that at a total cost to the United States of about $2,100,000,-000, Boeing re-manufactured the Army's fleet of Chinook CH–47 A/B/C model helicopters into Chinook CH–47(D) and MH47D/E helicopters, and the contracted work to those helicopters was performed in an "incompetent and dangerous manner" by Defendant (doc. 367). Moreover, Relator asserts that each of these "unsuitably, re-manufactured helicopters" were delivered by Boeing to the Government by operation of a claim for payment in the form of a "Standard Form DD–250" that falsely represented that the contracted helicopters conformed to all of the specified contract requirements (*Id.*). Relator avers that it has evidence that Defendant acted in a reckless manner by installing the defective gears without adequate inspection (*Id.*). For example, Relator alleges that Boeing for at least ten years prior to the Saudi crash had prior knowledge that the transmission helicopter gears were prone to certain grinding cracks and

1. Although Speco was initially a party to this action, as the original maker and supplier of the gears in question to Boeing, Speco filed for bankruptcy during the course of the present litigation. The trustee appointed by the United States Bankruptcy Court subsequently settled this action with the Government and Relator, with the approval of the bankruptcy court on behalf of Speco and its creditors.

2. The CH–47(D) Chinook helicopter is the Army's medium, tactical, heavy-lift, and transport helicopter, and is normally operated and crewed by a total of four soldiers (doc. 34).

3. Specifically, Relator asserts that "Aircraft 89–0165" (a CH–47(D) helicopter) was shipped by the Army, after delivery from Boeing, to the Persian Gulf for use in Operation Desert Shield/Desert Storm (doc. 367). Relator alleges that on January 11, 1991, during its 56th hour of operation, the defective transmission gear exploded, causing Aircraft 89–0165 to crash and catch fire (*Id.*). The resulting fire consumed the entire helicopter, a HMWWW truck, ammunition, and various es-

sential equipment, including a howitzer and its tow vehicle (*Id.*). Relator contends that the United States Army replaced Aircraft 89–0165 by buying a new CH–47(D) fully-equipped helicopter at a replacement cost of more than $12.7 million (*Id.*).

4. Relator submits that approximately eighteen months after the Saudi crash, and a year after Boeing reinspected the Speco-made gears, another transmission gear also broke due to a grinding crack and proximately caused the second helicopter incident at Ft. Meade, Md. (doc. 367). Relator alleges that about a half-a-dozen more Speco-made gears were pulled from service or inventory as a result of the 1993 Ft. Meade incident (*Id.*).

5. Although there were reported injuries and the loss of military equipment associated with the helicopter incidents in question, there were no reported fatalities in either the Saudi crash or the Ft. Meade hard landing (*Id.*).

breakage (*Id.*). Relator further alleges that the material from which the gears were made are especially susceptible to exactly the kind and type of burning and cracking that resulted in the crash of Aircraft 89–0165 (*Id.*).

Moreover, the Government and Relator aver in the Amended Complaint that "[b]y virtue of the acts described above, Boeing, by and through its officers, agents, and employees, knowingly submitted, and caused to be submitted, false or fraudulent claims for payment or approval to [its] officers, employees, or agents of the United States Government" (doc. 34). The Government concludes Count I with the contention that "[b]y reason of these payments made upon these false claims, the United States Government has been damaged as a result of Defendant's violations of the False Claims Act, arising under 31 U.S.C. §§ 3729(a)(1), (2), (3) & (7), for damages to be determined at trial...." (*Id.*).

The Amended Complaint further asserts claims against Defendant for: (1) payment by mistake, (2) unjust enrichment, (3) breach of contract, and (4) common law fraud (doc. 34). The Government seeks to recover treble damages based on the value of the first CH–47(D) helicopter and its contents, for the cost of repairing the second aircraft, and to treble those damages

under the False Claims Act of 1986 (*Id.*).[6] In addition, the Government asserts that it is entitled to treble damages for the delivery of other U.S. Army Chinook helicopters with allegedly non-conforming engine transmission gears that were manufactured by Speco from 1987 to 1995,[7] and statutory penalties of $5,0000 to $10,000 for the submission of each purportedly false claim for the helicopters in question (*Id.*).

In its Answer, Defendant submits a general denial of the Government's allegations of false claims, violations of the False Claims Act, and the resulting compensatory and statutory damages (doc. 161). Defendant defends by originally asserting a total of twelve (12) affirmative defenses that would individually or collectively relieve Defendant of all liability from the Government's claims (*Id.*).[8] Specifically, Defendant's Fifth Affirmative Defense states that the "United States cannot recover damages under the False Claims Act for the two helicopters, or their contents, which the [G]overnment alleges were lost or damaged as a consequence of defective parts...." (doc. 340). Defendant asserts that the False Claims Act precludes recovery for product defects, consequential damages[9], or any other recovery not found in the statute itself (*Id.*).

---

**6.** Relator asserts that Boeing paid Speco $4,874 for the cost of the defective gear involved in the Saudi crash, which Relator estimates to be less than one percent of the Government's actual loss (doc. 367).

**7.** The Government contends that while the cost of the remanufactured helicopter involved in the Saudi crash was estimated at about $4 million, the cost for its replacement was well over $12 million (doc. 34).

**8.** Defendant asserts the following affirmative defenses to the allegations set forth in the Amended Complaint: (1) failure to state a claim upon which relief can be granted; (2) the fraud cause of action is time-barred; (3) the damages sought are barred by the High–Value Items Clause; (4) estoppel due to the High–Value Items Clause; (5) consequential damages are not available; (6) no injury; (7)

failure to plead fraud with particularity; (8) laches; (9) express contract; (10) special damages are not pled with specificity; (11) punitive damages are not pled with particularity; and (12) equitable estoppel (doc. 161). Note: Defendant's Third Affirmative Defense, the High–Value Items Clause, was dismissed pursuant to this Court's Order of November 2, 1999 (doc. 554).

**9.** Defendant argues that the Government's alleged replacement cost of over $12 million for the Saudi helicopter is considered to be consequential damages under the False Claims Act (doc. 340). Therefore, even if Defendant is found liable for submitting a false claim for the defective gears to the Government, Defendant avers that, it would be at most liable to the Government for the cost of the gears, and not the consequential damages that allegedly follows the submission of the false claim (*Id.*).

On February 5, 1999, Defendant filed a Cross–Motion for Partial Summary Judgment as to the Measure of Damages (doc. 340) asserting that consequential damages are not recoverable under the False Claims Act. Thereafter, the Government filed a Response (doc. 366), Relator followed with his Response and Cross Motion for Summary Judgment as to the Measure of Damages (doc. 367), and Defendant filed its Reply on May 28, 1999 (doc. 401). Shortly thereafter, Relator filed his Reply (doc. 432). In addition, this Court heard oral arguments on the issue of consequential damages in relation to the False Claims Act on June 2, 1999 (doc. 444). On November 2, 1999, this Court issued an Order granting Aerospace Industries of America, Inc.'s (hereinafter, "Aerospace") an appearance in this action as *Amicus Curiae* and this Court will consider Aerospace's Motion in Support of Defendant's Cross–Motion for Partial Summary Judgment (doc. 402) in the Court's rulings on this matter. In addition, in our November 2nd Order, the Court also dismissed Defendant's Third Affirmative Defense, the High–Value Items Clause, and granted the Government's and Relator's motion for partial summary judgment on that issue (doc. 296) (*Id.*).[10] Finally, on November 12, 1999, Defendant filed a Motion Requesting the Court to Rule on Boeing's Cross–Motion for Partial Summary Judgment as to the Measure of Damages (doc. 556).

The Court believes it is important to note that, this Order will only address the primary issue of the applicability of Defendant's Fifth Affirmative Defense, which states that, "consequential damages are not recoverable under the False Claims Act" (doc. 340). Furthermore, any issues concerning the merits of the Government's and Relator's claims, or Defendant's remaining affirmative defenses will not be addressed by the Court in this Order. The Parties stipulate that for the purpose of summary judgment only, the Court may assume that liability against Defendant could be proven by the Government and Relator by a trial on the merits (docs. 340, 366 & 367). The Parties now move this Court to decide the purely legal question of what is the proper measure of damages in relation to the False Claims Act, and, specifically, are consequential damages available under the Act.

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. Id. at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino*, 980 F.2d at 405.

As the Supreme Court stated in *Celotex*, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324,

---

**10.** *See United States ex rel. Roby v. Boeing Co.*, 73 F.Supp.2d 897, 912 (S.D.Ohio 1999) (doc. 554).

106 S.Ct. 2548; *Guarino,* 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino,* 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### I. *Introduction To The False Claims Act*

#### A. *The "Qui Tam" Provisions of the FCA* [11]

The False Claims Act (hereinafter, "the FCA"), which Congress originally enacted in 1863, is the government's "primary litigative tool for combating fraud" against the federal government. S.Rep. No. 99–345, 99th Cong., 2d Sess., at 2, reprinted in 1986 U.S.C.C.A.N. 5266. The Act authorizes both the Attorney General and private persons to bring civil actions to enforce the Act. 31 U.S.C. § 3730 (1999). Congress amended the FCA in 1986 to increase the financial and other incentives for private individuals to bring suits under the Act in the hopes of enlisting the aid of

the citizenry in combating the rising problem of "sophisticated and widespread fraud." S.Rep. No. 99–345, at 2, 23–24 (1986).

Section 3730(b) of the FCA as now constituted provides that a person may bring a civil action for a violation of the substantive provisions of the Act "for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). The action must be brought in the name of the government. *Id.* An action under this provision is termed a *"qui tam"* [12] suit, and the person who brings such an action is referred to as a "relator" or "informer." *Id.* If the government files an action to enforce the FCA, a would-be relator may not later bring any action based on the same underlying facts. *Id.* § 3730(e)(3). Nor may a private party litigate a *qui tam* suit based on the public findings of a government investigation or on disclosures made in the news media, unless that party is an original and independent source of the information on which the complaint is based. *Id.* § 3730(e)(4)(A)-(B).

Upon bringing a *qui tam* action, a relator must serve on the government a copy of the complaint and written disclosure of substantially all material evidence and information the relator possesses. The complaint must be filed *in camera* and remain under seal for at least sixty (60) days so that the government may investigate the relator's allegations; though upon a showing of "good cause," the government may move the court for an extension of the sixty (60) day period. *Id.* § 3730(b)(2), (3). By the end of the period provided for the government to complete its investigation, the government must decide whether to intervene and proceed with the action, "in

---

**11.** The following summary of the history of the FCA was compiled in its entirety by a review of the Congressional Record and from the relevant portions of the Seventh Circuit's decision in *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 745–46 (9th Cir.1993) (holding that a former employee of a government contractor who brought an action against the contractor under the *qui tam* provisions of the FCA, met the Article III standing require-

ments and did not violate the Due Process Clause of the U.S. Constitution).

**12.** The term *"qui tam"* is short for *"qui tam pro domino rege quam pro se imposo sequitur,"* which is interpreted as he "who brings the action as well for the king as for himself." *Bass Anglers Sportsman's Soc'y of America v. U.S. Plywood–Champion Papers, Inc.,* 324 F.Supp. 302, 305 (S.D.Tex.1971).

which case the action shall be conducted by the government;"[13] or whether to decline to take over the action, "in which case the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

The original version of the FCA allowed anyone to bring a *qui tam* action and receive up to fifty percent (50%) of the amount recovered. S.Rep. No. 99–345, at 8–10 (1986). This broad provision led to abuse and in 1943, following the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 546–47, 63 S.Ct. 379, 87 L.Ed. 443 (1943),[14] Congress amended the statute. The 1943 version of the FCA precluded actions "based on evidence or information the Government had when the action was brought." *United States ex rel. Stinson v. Prudential Ins. Co.*, 944 F.2d 1149, 1153 (3d Cir.1991). This led to claims being barred even in cases where the *qui tam* supplied the information to the government before filing the claim. *See United States ex rel. State of Wis. v. Dean*, 729 F.2d 1100, 1106–07 (7th Cir.1984).[15]

In 1986, Congress again amended the FCA in order "to encourage any individual knowing of governmental fraud to bring that information forward." S.Rep. No. 99–345, at 2 (1986). According to the Third Circuit, in order "[t]o revitalize the *qui tam* provisions, the amendment provided incentives for private enforcement, including increased monetary awards, adopted a lower burden of proof, and allowed a *qui tam* to remain a party in the action even if the government intervenes." *Stinson*, 944 F.2d at 1154 (1991).

## B. *FCA Case Law Applied*

As amended in 1986, the False Claims Act provides that the terms " 'knowing and knowingly' mean that a person, with respect to information: (1) has actual knowledge of the information, (2) acts in deliberate ignorance of the truth or falsity of the information, or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b).

The archetypal *qui tam* action is filed by an employee at a private company who discovers his employer has overcharged for services or supplies under a government contract. *See United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 968–69 (9th Cir.1995) (holding that a former employee of a federal contractor, who had signed a release of all claims against the contractor in settlement of an earlier litigation, then the same employee brought a *qui tam* action against the same contractor under the FCA, and, nonetheless, was allowed to sue that contractor). However, FCA actions have also been sustained under theories of supplying substandard products or services;[16] false negotiation, including bid rigging and defective pricing;[17] and false certification[18].

In *United States v. Bornstein*, 423 U.S. 303, 311, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976), the Supreme Court reviewed the FCA in order to differentiate contracts from claims[19] that were submitted under

---

**13.** *Id.* § 3730(b)(4)(A).

**14.** In *Marcus*, the Supreme Court held that a relator could bring a *qui tam* action even though the action was based entirely upon information contained in the government indictment. *Id.*, 317 U.S. at 547–48, 63 S.Ct. 379 (1943).

**15.** The holding in *Dean*, was subsequently superseded by statute in a number of states (including Illinois, California, Maryland, Oklahoma, Virginia, Wisconsin, and Vermont).

**16.** *See United States v. Aerodex, Inc.*, 469 F.2d 1003 (5th Cir.1972).

**17.** *See United States v. Ehrlich*, 643 F.2d 634 (9th Cir.1981); *see also United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296 (6th Cir.1998).

**18.** *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir.1996).

**19.** The term "claim" is defined in 31 U.S.C. § 3729 of the False Claims Act and provides, in pertinent part, that:

[f]or purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property, which is made to a contractor,

contracts, holding that only the latter gave rise to liability under the FCA. The Supreme Court held that the defendant was liable under the statute because he engaged in conduct that caused the false claims to be submitted to the United States, and the Court explained that:

> [w]hile it is true that no false claims would have been submitted had [the defendant] and [its prime contractor] not entered into a contractual relationship, the entry into that relationship did not in itself cause the submission of any false claims ∴. The language of the statute focuses on false claims, not on contracts.

*Id.* at 311 (1976) (discussing *Marcus,* 317 U.S. at 552, 63 S.Ct. 379 (1943)). Similarly, in *United States v. Ueber,* 299 F.2d 310, 313 (6th Cir.1962), the Sixth Circuit held that a cause of action under the FCA did not arise "until the first voucher seeking payment of the false claims was presented to the United States." [20] In another case, the Sixth Circuit explained that if the "government [is] seeking to state a claim under the FCA [the government] must allege a false claim for payment made upon the government, not merely a fraudulent contract." *Kaminski v. Teledyne Indus., Inc.,* 121 F.3d 708, No. 96–3620, 1997 WL 415314, at *4 (6th Cir. July 21, 1997).

## II. *The Proper Measure Of Damages Under The False Claims Act*

### A. *Introduction*

The amended FCA provides that any person who knowingly presents a false or fraudulent claim to the United States "is liable to the United States Government for a civil penalty . . . plus three (3) times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a) (1999).[21] The FCA itself does not specify how to quantify damages, but instead states that the Government should be awarded damages that it "sustains because of" the contractor's fraudulent acts. *Id.* § 3729(a), (b) (1999). In *United States ex rel. Marcus v. Hess,* the Supreme Court established a simple "out of pocket" measure for the recovery of damages. 317 U.S. at 551–52, 63 S.Ct. 379 (1943). The Court found that damages under the FCA are intended to "provide for restitution to the government of money taken from it by fraud . . . ." *Id.* Trebling the damages and imposing penalties "was chosen to make sure that the government would be made completely whole." *Id.* The *Marcus* Court used a "but for" test in its analysis of FCA damages.[22] In other words, a court should ask the question of, "How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant?"[23] This amount would be the proper measure of damages according to the *Marcus* court. *Id.* at 551–52, 63 S.Ct. 379 (1943).

■ Because each case under the FCA involves unique types of damage to the government, a formula for calculating damages must be created for each case that will provide the government with its damages directly caused by the filing of a

grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. *Id.* § 3729(c).

**20.** *See also United States v. Ekelman & Assocs., Inc.,* 532 F.2d 545, 551–52 (6th Cir. 1976) (stating that "no cause of action arises . . . until the [defendant] presents a claim to the [government] for payment. . . .").

**21.** The FCA also contains an exception for those who voluntarily inform the government within thirty (30) days of learning of the false claim and were not subject to a governmental investigation prior to the disclosure to the government. Persons falling within this exception can limit their damages to two (2) times the amount of damages sustained by the government. *Id.*

**22.** *See* Michael A. DiSabatino, *Measure and Elements of Damages Under the False Claims Act,* 1977 WL 45669, 35 A.L.R. Fed. 805 (1977).

**23.** *Id.*

false claim. *BMY—Combat Systems Div. of Harsco Corp. v. United States,* 44 Fed. Cl. 141, 147–48 (Fed.Cl. 1999). In addition, the Ninth Circuit Court of Appeals found that "[o]rdinarily the measure of the government's damages would be the amount that it paid out by reason of the false [claims] over and above what it would have paid if the claims had been truthful." *United States v. Woodbury,* 359 F.2d 370, 379 (9th Cir.1966). In *United States v. Bornstein,* the Court applied a similar "benefit of the bargain" approach to calculating damages in FCA cases. 423 U.S. at 317 n. 13, 96 S.Ct. 523 (1976). The Supreme Court held that "[t]he Government's actual damages are equal to the difference between the market value [of the item] it received and retained, and the market value [that the item] would have had if they had been of the specified quality." *Id.*[24] The *Bornstein* Court cited *United States v. Ben Grunstein & Sons Co.,*[25] as a basis for its choice of the "benefit of the bargain" or "market value" approach. *Id.* The district court in *Grunstein* defined the proper measure of damages as "the value of the property which the person defrauded would have received but for the fraud, less, as a credit, the value of the

property which he has in fact received." *Id.,* 137 F.Supp. at 205 (1955).

Courts which have decided the issue thus far have confined their decisions to the particular type of fraud involved in each case. While the Supreme Court in *Bornstein* used a "benefit of the bargain" theory of damages, it did not overturn the "out of pocket" measure applied by the *Marcus* Court; which would infer that the Supreme Court will consider any reasonable method of calculating damages which will fairly reimburse the government for its losses and expenses, without creating a windfall for the government. *See Daff v. United States,* 31 Fed. Cl. 682, 695 (1994) (awarding as FCA damages the government's inspection and repair costs when the contractor had fraudulently concealed the failure of the product to pass the contractually required tests).[26]

We will now review the case law on consequential damages as applied in the federal courts. In the Fifth Circuit case that is highlighted in the next section, the court held that the government could not recover consequential damages resulting from the delivery of defective goods under a FCA theory of recovery.[27]

---

24. This is also referred to as a product's "diminished value," and is measured by calculating the fair market value of the product(s) the government contracted to buy less the fair market value of the product(s) that was actually received and retained. *See* C. Stanley Dees, *Beyond "Diminished Value": New Challenges in the Law of Civil False Claims Act Damages,* 25 Pub. Cont. L.J. 597, 599 (1996). However, in cases in which the market value of the product(s) is speculative, the court may utilize the contract price to establish damages. *Id.*

25. 137 F.Supp. 197, 205 (D.N.J.1955).

26. *See also* Anna Burke, *Qui Tam; Blowing the Whistle for Uncle Sam,* 21 Nova L.Rev. 869, 911 (1997).

27. The following excerpt on the common law rule of contract damages is taken from the contract treatise of John D. Calamari, *The Law of Contracts* § 14.5 (4th ed.1998):
*The Rule of Hadley v. Baxendale—*

(a) *Economic Injury*—Prior to 1854 there were almost no rules of contract damages. The assessment of damages was for the most part left to the unfettered discretion of the jury. In 1854, *Hadley v. Baxendale* was decided. 156 Eng. Rep. 145 (1854). It has won almost universal acceptance in the common law world and remains the leading case in the field. Under the first rule of *Hadley v. Baxendale,* certain damages will so naturally and obviously flow from the breach that everyone is deemed to contemplate them. Frequently such damages are known as "general damages." Under the second rule, less obvious kinds of damages are deemed to be contemplated if the promissor knows, or has reasons to know, the special circumstances which will give rise to such damages. Such damages are frequently known as "special" or "consequential damages."
*Id.*

## B. *United States v. Aerodex and Consequential Damages*

Questions regarding the meaning of "damages" under the FCA have their roots in the old act, which contained language virtually identical to the current damages provision.[28] The scope of the term "damages" was first addressed in the seminal case of *United States v. Aerodex*. In *Aerodex*, defendants were found civilly liable under the FCA for knowingly delivering contractually nonconforming ball bearings to the Navy Department. *Id.* 469 F.2d at 1013 (1972). Under its contract, Aerodex had delivered 300 nonconforming bearings at a price of $90 each for a total contract price of $27,000. *Id.* at 1006. The Navy subsequently discovered the product substitution, removed the ball bearings and replaced them at a cost of $160,000. *Id.* In assessing damages, the district court included not only the contract price the Navy paid, $27,000, but also the $160,000 in "repair costs." *Id.*

The Fifth Circuit reversed the district court's damages calculation. *Id.* at 1011 (1972). The court noted that in cases involving defective products, the United States should receive as damages the difference between the reasonable value of the goods delivered and the price the government actually paid for the goods. *Id.* The *Aerodex* court concluded that the repair costs were consequential damages,

and, as such, those costs were not recoverable under the Act:

> [W]e hold that the language of the False Claims Act does not include consequential damages resulting from the delivery of defective goods. The statute assesses double damages attributable to the "act," which in this case is the submission of the false vouchers. The submission of these vouchers was not the cause of the government's consequential damages. The delivery and installation of the bearings in the airplanes, not the filing of the false claim, caused the consequential damages.

*Id.* at 1011 (1972); *see also Woodbury*, 359 F.2d at 379 (1966) ("In a case of this kind, damages under the False Claim Act must be measured by the amount wrongfully paid to satisfy the false claim."). Thus, the United States in *Aerodex* was entitled to only the contract price doubled, or $54,000, and not the more than $370,000 that was originally awarded the government by the district court. *Id.*

The FCA cases that came after *Aerodex*, but before the 1986 Amendments, "muddied the waters" as to the recoverability of consequential damages.[29] While some of these decisions adhered closely to *Aerodex* in denying any economic or consequential loss outside of the contract price,[30] other courts have showed a greater willingness to allow the recovery of the various costs incurred by the government beyond the mere value of the contract.[31] Like a num-

---

**28.** *See* Michael Waldman, *"Damage Control": A Defendant's Approach to the Damage and Penalty Provisions of the Civil False Claims Act*, 21 Pub. Cont. L.J. 131, 136 (1992).

**29.** *See* James Dever, *Double Jeopardy, False Claims, and United States v. Halper*, 20 Pub. Cont. L.J. 56, 86 (1990).

**30.** *See, e.g., United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir.1981) (holding that the United States cannot recover consequential damages under the Act); *United States v. Hibbs*, 568 F.2d 347, 351–352 (3d Cir.1977) (holding that the United States must show a causal connection between the loss and the fraudulent conduct, and also finding that a broad "but for" test is not consistent with the Act).

**31.** se *See e.g., Toepleman v. United States*, 263 F.2d 697, 700–01 (4th Cir.1959) (holding that the United States is entitled to recover double the loss it suffered "but for the fraud"); *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir.1966) (holding that the United States may recover "money spent by its employees in straightening out the mess [caused by the false claims] and in protecting its interest thereafter"); *United States v. Ekelman & Assocs., Inc.*, 532 F.2d 545, 550–51 (6th Cir. 1976) (holding that the United States can recover not only the payment to discharge insured loans obtained through false claims, but also the reasonable expenses incurred in preserving the properties that served as collateral for the loans).

ber of post-*Aerodex* courts, the Sixth Circuit in *Ekelman & Assocs,* found that *Aerodex* was distinguishable on its facts and also found that its holding "was not inconsistent with" the Fifth Circuit's holding in *Aerodex.* 532 F.2d at 545 (1976).[32]

### C. The 1986 Amendments and Consequential Damages [33]

Initially, Congress indicated that the 1986 Amendments would permit the recovery of consequential damages under the Act. The Senate bill would have amended 31 U.S.C. § 3729(a) to read as follows: "A person is liable to the United States Government for a civil penalty of $10,000, an amount equal to three (3) times the amount of damages, in addition to the amount of consequential damages the Government sustains because of the act of that person...." S.Rep. No. 345, 99th Cong., 2d Sess. 39 (1986). The bill defined consequential damages as those which the United States would not have sustained "but for" the violation of the Act or "having entered into or made any contract or grant as a result of any material part of any false statement." *Id.* at 39–40 (discussing changes to § 3729(b)). The Senate expressly rejected the "narrow and form bound interpretation of the act" found in *Aerodex.* S.Rep. No. 345, 99th Cong., 2d Sess. 19, reprinted in 1986 U.S.Code Cong. & Admin. News 5284. Originally, the House bill also contained language concerning consequential damages. H.R.Rep. No. 660, 99th Cong., 2d Sess. 1–2 (1986). The House bill would have amended § 3729(a) to read as follows: "[Any person who violates the Act] is liable to the Unit-

ed States Government for a civil penalty of not less than $5,000 and not more than $10,000, for an amount equal to consequential damages as set forth in subsection (b)(1) plus two (2) times the amount of damages (other than such consequential damages) which the Government sustains because of the act of that person...." *Id.* Subsection (b)(1) defined consequential damages in a manner similar to the Senate bill. *Id.* at 2.

Although both the House and the Senate initially agreed that consequential damages would be recoverable under the Act and that such damages would not be trebled, Senator Grassley offered an amendment on October 3, 1986, deleting any mention of consequential damages. 132 Cong. Rec. S15018–23 (daily ed. Oct. 3, 1986). Senator Grassley explained that House and Senate negotiators had met and reconciled their differences in the House and Senate bills. 132 Cong. Rec. S15515 (daily ed. Oct. 7, 1986) (statement of Sen. Grassley); *cf.* 132 Cong. Rec. H6481 (Sept. 9, 1986) (statement of Rep. Brown) (expressing hope that the Congressional conference would limit consequential damages to those which are reasonably foreseeable and proximately caused by the prohibited acts). As part of that process, forfeitures would be determined by the court "within the range of $5,000 to $10,-000, and consequential damages will not be recoverable under the Act." 132 Cong. Rec. S15515 (daily ed. Oct. 7, 1986) (statement of Sen. Grassley). The House agreed to the change, but did not explain why the change was made. *See* 132 Cong. Rec. H9382–83, 9388 (daily ed. Oct. 7,

---

**32.** In *Ekelman & Assocs.,* the government spent money maintaining property after the defendants went into default on a loan obtained through falsified applications. *Id.,* 532 F.2d at 547. These "maintenance costs" (i.e., "incidental expenses") incurred after foreclosure, were included within the government's damage award. *Id.* The Sixth Circuit distinguished *Aerodex,* stating that it was not inconsistent with this decision, indicating a possible effort to distinguish between "incidental or maintenance" damages and "economic or consequential" damages. *Id.; see also* Kara Nicole Schmidt, *Privatizing Enviromental En-*

*forcement: The Bounty Incentives of the False Claims Act,* 9 Geo. Int'l Envtl. L.Rev. 663, 678 (1997).

**33.** The following summary of the legislative history of the 1986 Amendments in relation to the issue of consequential damages was compiled in its entirety by a review of the Congressional Record and from relevant portions of the following law review article: James Dever, *Double Jeopardy, False Claims, and United States v. Halper,* 20 Pub. Cont. L.J. 56, 86 (1990).

1986) (statement of Rep. Glickman). Thus, post–1986 Amendments courts are left to analyze arguments concerning causation in order to determine whether damages were sustained "because of the act." 31 U.S.C. § 3729(a) (1988).

Furthermore, the question of consequential damages does not appear to be settled at the present time. After a review of the most recent and relevant case holdings addressing this issue, we find that almost all of these cases are distinguished by the particular facts of the case in question. The holdings range from those that adhere strictly to the *Aerodex* ruling, and those that expand upon the holding of *Aerodex* in their award of additional recovery beyond the value of the item in question. The only consistency in the various cases that address the issue of the proper measure of recovery under the FCA, is that all of the courts attempt to find a way to "make the government whole."

### D. The Parties's Arguments

#### 1. Boeing's and Aerospace's Arguments [34]

In Defendant's Cross–Motion for Partial Summary Judgment (doc. 340) and Aerospace's Motion in Support of Defendant's Cross–Motion (doc. 402), Defendants seeks summary judgment as a matter of law as to their Fifth Affirmative Defense. The Fifth Affirmative Defense is brought on the grounds that the Government cannot recover damages under the FCA for replacement and repair costs of the destroyed or damaged helicopters, or their contents, which the Government alleges were lost or damaged as a result of the defective component parts (the transmission gears) that were supplied by Speco and Boeing (*Id.*). Defendants assert that the Government's attempt to recover for the loss or damage of the helicopters under a False Claims Act theory of recovery is founded on a "fallacious assumption" for several reasons (*Id.*).

First, Defendants allege that the FCA is not a products liability statute. Defendants also allege that damages under the FCA are those that result from the submission and payment of a false claim and not the damages that flows from any defect in the product for which a claim is made. Furthermore, Defendants assert that it is unaware of any case in which the Government has recovered under the FCA for damage to property or persons that resulted from an underlying product defect.

Second, Defendants contend that the Supreme Court has stated unambiguously that the appropriate measure on which to base damages under the FCA is the difference between the value of the claims paid and the value of the goods as delivered. *See Bornstein*, 423 U.S. at 317 n. 13, 96 S.Ct. 523 (1976). With respect to FCA claims involving the delivery of defective products, Defendants submit that, this rule is applied to compensate the Government for an amount reflective of any inferior product delivered to it, and not for the resulting damages caused by a product's defect. *See Aerodex*, 469 F.2d at 1011 (1972) (holding that the FCA does not include consequential damages resulting from the delivery of defective goods).

Third, Defendants allege that even if all of the Government's and Relator's allegations contained in the Amended Complaint (doc. 34) could be proven as true, the helicopter damages would not stem from the submission of a claim, but rather from an alleged failure in the operation of the purportedly defective gears. Thus, according to Defendants, the helicopter damages are not compensable under a FCA theory of recovery (*Id.*).[35] *See Commer-*

---

**34.** For purposes of this section of the Order only, Boeing and Aerospace will be referred to hereinafter, as "Defendants."

**35.** Defendants assert that the Fifth Circuit in *Aerodex* held that the cost of removal and

replacement of the defective product is not compensable under the FCA:

> [T]he language of the False Claims Act does not include consequential damages resulting from the delivery of defective goods. The statute assesses double damages attributable to the "act," which in this case is the

*cial Contractors, Inc. v. United States,* 154 F.3d 1357, 1371–72 (Fed.Cir.1998) (holding that the government must prove that it sustained an actual loss "as a result of the contractor's false or fraudulent claim").

Fourth, Defendants argue that the proper measure of FCA damages in this case is the difference between the value of noncompliant gears and the value of the compliant gears. Moreover, Defendants assert that this is the established rule for damages in FCA claims premised on the delivery of defective goods. As set out in *Aerodex,* such damages are to be measured by "the amount wrongfully paid to satisfy the false claim." 469 F.2d at 1011 (1972). Simply put, Defendants maintain that, even if the Government's allegations were proven as true by a trial on the merits, the Government would then be "entitled to a judgment ... in an amount which reflects only the actually defective or inferior [item] delivered to the Government." *See United States v. Collyer Insulated Wire Co.,* 94 F.Supp. 493, 498 (D.R.I. 1950).[36] Thus, Defendants submit that the proper measure of damages in the FCA claim at issue would be to treble the damages for the "diminished value" of any defective, transmission gears; and any additional statutory penalties that are applicable for each purported false claim submitted.

> submission of the false vouchers. The submission of these vouchers was not the cause of the government's consequential damages. The delivery and installation of the bearings in airplanes, not the filing of the false claim, caused the consequential damages.
> *Id.* at 1011 (1972).

**36.** *See also United States ex rel. Compton v. Midwest Specialties,* 142 F.3d at 304 (1998) (finding that the proper measure of damages under the FCA is the difference between the value of goods as delivered and the value of goods as promised); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 62 (8th Cir.1973) (" '[T]he measure of the govern-

## 2. *The Government's and Relator's Arguments* [37]

In the Government's Response (doc. 366) and Realtor's Response and Cross–Motion for Summary Judgment (doc. 367), Plaintiffs also seek summary judgment as a matter of law as to the Fifth Affirmative Defense asserted by Defendant. Plaintiffs assert that the United States may recover full replacement and repair costs under the FCA for the helicopters that were destroyed or damaged due to their internal defects. Plaintiffs argue that the proper measure of damages in this case according to the Supreme Court and the Sixth Circuit precedents is whatever it takes "to make the Government whole" once liability is established. *See Marcus,* 317 U.S. at 551–52, 63 S.Ct. 379 (1943) ("Damages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injury done it.' "), *accord, Bornstein,* 423 U.S. at 314–15, 96 S.Ct. 523 (1976).[38] Plaintiffs also set forth several points in order to counter the arguments presented by Defendants in their Cross–Motion for Partial Summary Judgment (docs. 340 & 402).

First, Plaintiffs counter Defendants arguments by asserting that it is an "irrefutable fact" that the United States did not buy gears from Boeing. Rather, Plaintiffs claim that the United States bought helicopters from Boeing that contained defective gears. Moreover, Plaintiffs allege

> ment's damages would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful.' ") (quoting *Woodbury,* 359 F.2d at 379 (1966)).

**37.** For purposes of this section of the Order only, the Government and Relator will be referred to hereinafter, as "Plaintiffs."

**38.** *See also Compton,* 142 F.3d at 304 (1998) ("While Midwest cites to several cases supporting the practice of deducting the value received by the government from any damage award, even these cases recognize that the government is entitled to full damages where it proves it received no value at all.").

that *Aerodex* and the issue of consequential damages is not applicable to the facts and issues at bar. Plaintiffs further allege that Boeing submitted claims to the United States which represented that the CH–47(D) helicopters conformed to the contract specifications, when Boeing knew all along that the helicopters did not conform to the contract requirement. Therefore, Plaintiffs reason that, the damage to the helicopters resulting from the failure of the Speco-made gears is direct, and not consequential, damages under the FCA. Plaintiffs assert that nothing in *Aerodex* is contrary to Plaintiffs' damages analysis in this case.

Second, Plaintiffs contend that damages under the FCA are designed to make the United States whole and submit that the Supreme Court has taken an "expansive view" on the issue of damages that are available under the FCA. *See Marcus*, 317 U.S. at 551–52, 63 S.Ct. 379 (1943) (finding that the chief purpose of the FCA was to provide restitution to make sure the government would be made completely whole); *see also Compton*, 142 F.3d at 304 (1998) ("Damages awarded under the False Claims Act typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'") (quoting *Marcus*, 317 U.S. at 549, 63 S.Ct. 379). Therefore, Plaintiffs argue that, in order for the United States to be made whole in this case, its recovery must include the replacement and repair costs of the destroyed and damaged helicopters. *See Faulk v. United States*, 198 F.2d 169, 173 (5th Cir.1952) (finding that under a FCA theory of recovery, there is flexibility in measuring damages, and, subsequently, affirming the district court's refusal to instruct the jury on the market value of reconstituted milk because the

unconsumed milk had no market value to the Army).

Third, although Boeing "knew," within the meaning of the FCA, that the gears did not comply with the contract requirements, Plaintiffs allege that Boeing, nonetheless, submitted claims for the repayment of the helicopters which were represented as being in conformance with the contract specifications, including the specifications concerning the transmission gears. Furthermore, Plaintiffs allege that two of these helicopters failed while in flight due to the non-conformities in the transmission gears, namely cracks in or near the dampening ring groves. Plaintiffs reason that the end result is that the damages to these helicopters are direct, and not consequential. Thus, Plaintiffs argue that damages, such as those described above, which are the natural and proximate cause of an occurrence are not considered "consequential damages," but rather are deemed "direct damages." [39] *See Grunstein & Sons*, 137 F.Supp. at 210 (1955) (finding that the FCA provides for "damages that naturally and proximately resulted from the fraud").

Fourth, Plaintiffs contend that not only is the replacement cost of the helicopters recoverable under the FCA, but more recent court decisions have also allowed the exact sort of damages that were previously disallowed by the Fifth Circuit in *Aerodex*.[40] *See BMY—Combat*, 44 Fed.Cl. 141, 149–52. Plaintiffs submit that if Defendant is found liable in this action, then it should be required to pay the full replacement, repair, and retrofitting costs of the destroyed and damaged CH–47(D) helicopters.

**39.** "Direct damages" are defined by *Black's Law Dictionary*, 270–71 (6th ed.1990) as:

> Direct damages are such as follow immediately upon the act done. Damages which arise naturally or ordinarily from a breach of contract; they are damages which in the ordinary course of human experience, can be expected to result from a breach.

*Id.*

**40.** Plaintiffs further contend that even in *Aerodex*, the Fifth Circuit affirmed the award of double the entire contract price for the mislabeled and misnumbered ball bearings because the mislabeled bearings had no value to the United States, which never received what it contracted to receive. *Id.* at 1011 (1972).

Finally, Plaintiffs argue that *Aerodex* is simply not consistent with the principle of awarding the United States all of its damages in order to make it completely whole, as required by *Marcus, Bornstein, Ekelman & Assocs., Compton,* and *BMY–Combat.* Moreover, Plaintiffs assert that *Aerodex*'s reasoning is based upon unique facts, because the court determined that a different theory of recovery (breach of warranty) was an alternate means by which the government could recover for its ball bearing-removal damages, without doubling the value of the claim or awarding consequential damages. *Id.* at 1012 (1972). Plaintiffs reason that *Aerodex* is an example of "rough justice" in which "the court doubled the entire contract price without requiring a relatively small component manufacturer to bear the cost of damages it did not directly control, while still making the government whole" (docs. 366 & 367). Thus, Plaintiffs state that "the wooden application of *Aerodex* which Boeing now advocates is demonstrably inconsistent with both the old and new holdings of the Sixth Circuit" (doc. 367). *See Ekelman & Assocs.,* 532 F.2d at 551 (1976) (affirming the district court's conclusion that the post-foreclosure expenses were recoverable under the FCA).

### III. *The Court's Analysis*

There are essentially two issues presented to this Court by the Parties in this matter. The first issue is relatively simple and straight forward: "Are consequential damages recoverable under the False Claims Act?" The second issue is much more complicated, fact dependent, and unsettled: "Assuming Defendant is found liable in this action at a trial on the merits, would the Government's helicopter damages, and the related expenses associated with it, be considered consequential damages or direct damages under the False Claims Act of 1986?"

### A. *Consequential Damages [41] Are Not Available Under The FCA*

■ This Court holds as a matter of law that consequential damages are not available, and, thus, are not recoverable under the False Claims Act of 1986. There are several reasons that leads the Court to this conclusion.

First, in the Court's November 2, 1999 Order (doc. 554), we held as a matter of law in this same action that the High–Value Items Clause (hereinafter, "the HVIC") was inapplicable to the False Claims Act because the Act itself was silent as to whether the HVIC provided a contractor-defendant an affirmative defense to violations under the statute. *Roby v. Boeing,* 73 F.Supp.2d 897, 910. In reaching this conclusion the Court explained that:

> [t]he very fact that Congress was willing to amend the terms and provisions of the FCA in 1943 and 1986, while not including the application of the HVIC as a limitation or defense to the statute's penalty provisions, is powerful evidence that Congress never planned for the HVIC's applicability to the FCA.

*Id.* For exactly the same reason, this Court must also hold that consequential damages are not applicable to the FCA. The record is undisputed that the issue of consequential damages was proposed, debated, and considered by the Congress during the 1986 Amendments to the FCA. However, the Congress, in its ultimate wisdom, decided to exclude the recovery of consequential damages from the final version of the Act.[42] This Court is unwilling to

---

**41.** *Black's Law Dictionary* 270–71 (6th ed.1990) defines "consequential damages" as: "[s]uch damage, loss or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such an act;" and as "[d]amages which arise from the intervention of special circumstances not ordinarily predictable."

*Id.*

**42.** On the floor of the House, the leading proponent of the 1986 Amendment to the FCA, Rep. Glickman, explained that the bill that emerged from conference "provides for treble damages and deletes consequential damages." 132 Cong. Rec. 29,321 (1986).

interpret the FCA in the way that the Government and Relator may want in this case. Moreover, the power to amend the statute rests with the Congress and the power to disagree with the holding of *Aerodex* and its progeny rests with the Sixth Circuit. This Court can only highlight that, as of the date of this Order, neither the Congress nor the Sixth Circuit has found consequential damages to be recoverable under the FCA. Furthermore, we cannot substitute our judgment for the will of Congress or the precedents's of this Circuit.

Second, the Supreme Court has explained that the proper measure of damages for false claims are calculated by the differences in the value between what the government contracted for and what the government actually received. *See Bornstein*, 423 U.S. at 317 n. 13, 96 S.Ct. 523 (1976) ("The Government's actual damages are equal to the difference between the market value of the tubes it received and retained, and the market value that the tubes would have had if they had been of the specified quality.").

Third, the Government and Relator cite frequently to the case of *BMY–Combat*, in which the court stated it was "likely" to allow recovery for damages such as the costs to inspect and repair the defective brackets installed in the howitzers. *Id.* 44 Fed.Cl. at 147–48. There are two important points that the Government and Relator overlook in their reliance on *BMY–Combat*. The court adopted the holding of *Aerodex* stating that consequential damages are unavailable under the FCA,[43] and the court did not grant the government's

motion for summary judgment on their theory of damages. *Id.* at 152–53 (1999).

After reviewing the Parties' briefs, exhibits, and evidence and after considering the oral arguments presented at the June 2, 1999 hearing, the Court concludes that there are no genuine issues of material fact that preclude the Court from rendering a judgment as to the merits of Defendant's Cross–Motion for Partial Summary Judgment (doc. 340). Therefore, for the reasons set forth above, this Court finds Defendant's arguments as to the general issue of consequential damages to be well-taken.

### B. *Alternate Theories of Recovery Are Available Under the FCA*

■ This Court having found in favor of Defendant on the issue of consequential damages as not being recoverable under the False Claims Act of 1986, cannot so find that the Government and Relator are unable to recover the replacement and repair value of the destroyed and damaged helicopters, as well as the related costs and expenses associated with it. The damages in this case must be determined by the application of proximate causation[44] and foreseeability,[45] in an effort to make the Government whole. However, this "begs the question: make whole for what?" The answer to this question is supplied by the Sixth Circuit. "Damages awarded under the False Claims Act typically are calculated to ensure that they 'afford the government complete indemnity for the injury done it.'" *Compton*, 142 F.3d at 304 (1998) (quoting *Marcus*, 317

---

43. The *BMY–Combat* court stated that:
    Courts utilize several methods of damage calculations intended to ensure that the government receives 'the benefit of its bargain,' being careful not to award consequential damages.
    *Id.* at 149 (1999) (citing *Aerodex*, 469 F.2d at 1011 (1972)).

44. "Proximate cause" is defined in *Black's Law Dictionary*, 852 (6th ed.1990) as:
    Proximate cause is that which in a natural and continuous sequence, unbroken by any

efficient intervening causes, produces injury, and without which the result would not have occurred.
    *Id.*

45. "Foreseebility" is defined in *Black's law Dictionary*, 449 (6th ed.1990) as:
    Foreseeability is that which is objectively reasonable to expect, not merely what might conceivably occur.
    *Id.*

U.S. at 549, 63 S.Ct. 379 (1943)). In a motion for summary judgment, the Court must assume as true the facts of the non-movant (i.e., Relator) as true. Indeed, Defendant asserts in its Cross–Motion that even if the Government' and Relator's facts are true, they still could not recover any more than the cost of the defective transmission gears in question.[46] This Court finds, assuming Defendant is found liable at a trial on the merits, that genuine issues of material fact preclude the Court from granting summary judgment on the issue of the recovery of the replacement and repair costs of the helicopters in question for several reasons.

First, *Bornstein* in no way purports to establish a "fixed rule of damages."[47] The Supreme Court reaffirmed in *Bornstein* what it had earlier held in *Marcus*—that "the device of double damages plus a specific sum [as a civil penalty] was chosen to make sure that the government would be made completely whole." *Id.* 423 U.S. at 314, 96 S.Ct. 523 (1976) (quoting *Marcus,* 317 U.S. at 551–52, 63 S.Ct. 379 (1943)).

Indeed, other courts have recognized that *Bornstein* did not purport to lay down an immutable rule of damages. *See BMY– Combat,* 44 Fed.Cl. at 147 ("Because each case under the FCA involves unique types of damage to the government, a formula for calculating damages must be created for each case that will provide the government with its damages directly caused by the filing of a false claim.").[48] Defendant has not cited to a single FCA case in which products were destroyed as a result of a latent defect in a bad part, and, subsequently, the government's damages were calculated on the basis of the value of only the part. In fact, after a thorough review of the case law in this area, this Court has not found any case which is on point with the facts and issues of the case at bar. Therefore, cases such as *Bornstein* and *Aerodex*[49] can serve only as a guide, but does not establish a "one-size-fits-all" damages interpretation.[50]

Second, Defendant asserts that the proper measure of damages in this case is

**46.** The transmission gears in question had a estimated value in 1993 to be approximately $5,000 in 1991 (*see* docs. 366 & 367). The CH–47(D) helicopter have an estimated replacement value of approximately 12 million.

**47.** *Bornstein* was concerned only with the issue of damages and penalties against a subcontractor who causes the prime contractor to submit false claims. 423 U.S. at 306, 96 S.Ct. 523 (1976). The prime contractor in that case had already settled with the government. *Id.*

**48.** The Eleventh Circuit explained in *United States v. Killough,* 848 F.2d 1523, 1532 (11th Cir.1988) that:
> [n]o single rule can be, or should be, stated for the determination of damages under the Act ... Fraudulent interference with the government's activities damages the government in numerous ways that vary from case to case. Accordingly, the [Congressional Committee] believes that the courts should remain free to fashion the measure of damages on a case by case basis.

*Id.* (quoting S.Rep. No. 615, 96th Cong.2d Sess. at 4 (1986)).

**49.** The case at bar is also distinguishable from *Aerodex* in several ways including: (1) *Aerodex*

involved a manufacturer of component parts, while Boeing is a manufacturer of helicopters; (2) *Aerodex* involved delivery of individual components for later installation into airplanes, while Relator alleges that Boeing led the United States to believe that the helicopters that were delivered, "required nothing more than a pre-flight check and a Chinook pilot's expertise" (doc. 367). Note: The Court recognizes that Relator's allegations are but one of the many factual disputes that exist between the Parties to this litigation.

**50.** The Supreme Court in *Bornstein* addressed the very issue of a "one-size-fits-all" approach to assessing damages under the FCA:
> To equate the number of forfeitures with the number of contracts would in a case such as this result in almost always in a single forfeiture, no matter how many fraudulent acts the subcontractor might have committed. This result would not only be at odds with the statutory language; it would also defeat the statutory purpose. Such a limitation would in the language of the Government's brief, convert the Act's forfeiture provision into little more than a $2,000 license for subcontractor fraud.

*Bornstein,* 423 U.S. at 311, 96 S.Ct. 523 (1976).

the difference between the value of the helicopter with a good gear and the value of the same helicopter with a bad gear. We find that Defendant's proposed measure of damages may fail in light of the Government's and Relator's claims. The Government and Realtor aver that the value of the helicopter as delivered was less than nothing: "Boeing's false certification of compliance rendered the helicopter not only non-air worthy, but a hazard to the soldiers whose orders required them to occupy it in flight" (doc. 432). *See Compton*, 142 F.3d at 304 (1998) (finding that the value of the product delivered to the government was zero, the court awarded the government the full contract price).[51] For example, if indeed the Government and Relator are able to prove at trial that the helicopter as delivered by Defendant was valued at zero due to the defective gears, Defendant may be liable for the replacement and repair costs of the helicopters.[52]

Third, as earlier noted, other courts have found that direct, incidental, and maintenance damages are recoverable under the FCA. If the Government and Relator are able to prove at trial that the damage to the CH–47(D) helicopters was

as a direct, proximate, and foreseeable result of the false representations made by Boeing to the United States that the helicopters conformed to the contract requirements, those damages may then be found to be recoverable.[53] Moreover, assuming for a moment that the Government and Relator are able to prove their allegations of fact and direct damages to be true, then the issue of consequential damages and its application would not only be inapplicable to the case at bar, but would also no longer act as a bar to "making the government whole." [54]

Fourth, the FCA provides that the United States may recover those damages "which the Government sustains because of the act of" the defendant. 31 U.S.C. § 3729(a) (1999). Of course, this Court recognizes that no physical damage is ever physically and immediately "caused" by the mere "act" of filing a piece of paper. Rather, damage is caused by what that piece of paper causes. So the issue in this case boils down to one of causation, specifically, proximate causation. It is undisputed by either Party and by the relevant case law that the direct causation of damages is recoverable under the Act. Until the Government and Relator are given an

---

51. Defendant contends that "the Government cannot realistically assert that the helicopters as delivered to the Army possessed no value" (doc. 401). However, Relator replies that:

> [h]ere, the "value" of Helicopter 89–0165 was, at the time of delivery, less than "zero" because the Government not only had to buy a new helicopter to replace the one which burned in Saudi Arabia and had to rebuild the one which crashed at Fort Meade, but also has had to spend millions on investigation and litigation expenses. Thus, to the extent Defendant relies upon the proposition that the helicopter, falsely certified as compliant, had "value" when delivered, it is simply mistaken.

(doc. 432).

52. As the Sixth Circuit stated in *Ekelman*, 532 F.2d at 550 (1976), recoverable damages are those which "naturally and proximately flow from the 'act' of filing a fraudulent claim under the Act." Furthermore, in *Hibbs*, 568 F.2d at 351 (1977), the Third Circuit held that the statute "compels consideration of the ele-

ment of causation," which is to be "liberally construed so as to provide the government restitution from those whose fraud has caused loss" by considering "the relationship between the unlawful act and the injury ultimately sustained."

53. *See Ben Grunstein & Sons*, 137 F.Supp. at 210 (1955) (finding that the FCA authorizes damages that are the natural and proximate result of the fraud at issue).

54. As the Sixth Circuit explained in *Mead Corp. v. McNally–Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1209 n. 17 (6th Cir.1981): "[C]onsequential damages" are those "resulting in the ordinary course of events from the seller's breach". The *Mead* court also recognized that the element of "proximity" is "inherent in consequential damages." *Id.* The court concluded that Mead's increased labor costs in completing work left undone was not consequential damage, and that such amounts were therefore recoverable by McNally as direct losses. *Id.* at 1209.

opportunity to present their evidence at trial, this Court is unwilling to conclude as a matter of law that they are unable to prove their claims. Defendant moves this Court to summarily adjudicate the exact measure of damages by concluding that at most, Boeing is liable for the price of a fully-conforming transmission gear, as opposed to the replacement and repair value of multi-million dollar helicopters and their related contents that were actually destroyed or damaged in Saudi Arabia and Ft. Meade., Md. Moreover, Defendant ask this Court to conclude on a motion for summary judgment that the Government should not be allowed to present evidence at trial that may indeed prove that the damages at issue in this matter are the direct, proximate, and foreseeable result of the claims submitted by Defendant. This Court finds Defendant's Cross–Motion as to this issue to be premature and inappropriate at this time.

Fifth, in his Reply, Relator confronts Defendant with an interesting rhetorical question: "The question which Boeing did not answer is how is it possible to make the United States whole for the complete loss in Saudi Arabia of Helicopter 89–0165 and all that was aboard it, and the damage to Helicopter 86–1671 at Fort Meade, by paying three times the price of the broken transmission gears" (doc. 432). This Court finds that genuine issues of material fact prevent this Court from answering Relator's question at this time. The question set forth above is precisely why we find that summary judgment is premature and inappropriate as to this issue at this time, and that a trial on the merits is necessary in order to decide which of the Government's and Relator's alleged damages are consequential, and which are direct.

Furthermore, the Court finds that to prematurely preclude the Government and Relator from having an opportunity to prove its alleged damages at a trial on the merits, would not be in the fundamental interest of fairness and justice. We believe that the Government and Relator should be given an opportunity to prove their case on the issue of merit and dam-

ages in this matter. If this Court determines at trial that the only damages presented by the Government and Relator are of a consequential nature, then those damages would not be available to the Government and Relator under a FCA theory. However, if the Government and Relator present sufficient evidence that the damages sought are of a direct, proximate, and foreseeable nature, then those damages may be available to the Government and Relator under a FCA theory of recovery. *See Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1459 n. 30 (S.D.N.Y.1986) ("We reserve for trial the question of whether the plaintiff's claimed damages should be characterized as direct, incidental, or consequential."); *see also American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 459 (S.D.N.Y.1976) ("In general, the precise demarcation between direct and consequential damages is a question of fact").

### C. *The Court's Summary*

In conclusion, this Court finds that consequential damages are not recoverable under the False Claims Act. However, we do find that in the Sixth Circuit, direct and incidental damages are recoverable under the False Claims Act. It remains a question of fact to be decided at trial whether the Government's and Relator's allegations and theories of injuries, damages, and recovery are consequential, direct, or incidental in nature. This Court also finds that it would be inappropriate, premature, and against the interest of fairness and justice to decide this issue on a motion for summary judgment. Thus, this Court finds neither Parties' Cross–Motion for Summary Judgment to be persuasive on the issue of the Government's and Relator's actual measure of damages in this matter.

Accordingly, we hereby hold as a matter of law that Defendant's Cross–Motion for Partial Summary Judgment as to the Measure of Damages is hereby GRANTED IN

PART for the reasons noted by the Court in Section IV of this Order. In addition, for the reasons set forth above Relator's Cross–Motion for Summary Judgment as to the Measure of Damages (doc. 367) is hereby DENIED.

Furthermore, having reviewed this matter, the Court finds that genuine issues of material fact preclude this Court from finding as a matter of law that the Government is not entitled to the replacement and repair value, as well as the associated costs of the destroyed and damaged helicopters. Therefore, for the reasons set forth above, Defendant's Cross–Motion for Partial Summary Judgment (doc. 340) is not well-taken in regards to this issue, and is therefore DENIED. In addition, for the same reasons set forth above, Relator's Cross–Motion for Summary Judgment (doc. 367) is also DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's Cross–Motion for Partial Summary Judgment as to the Measure of Damages (doc. 340) is GRANTED IN PART in relation to the general issue of consequential damages, and DENIED in relation to the issue of preclusion of the Government's replacement and repair helicopter costs. Furthermore, Relator's Cross–Motion for Summary Judgment (doc. 367) as to the Measure of Damages is DENIED.

SO ORDERED.