*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0315P (6th Cir.)
File Name: 02a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA
ex rel. BRETT ROBY,
       *Plaintiff-Appellee,*

     *v.*

BOEING CO.,
       *Defendant-Appellant.*

No. 00-4157

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 95-00375—S. Arthur Spiegel, Senior District Judge.

Argued: January 25, 2002

Decided and Filed: September 12, 2002

Before: MERRITT, BOGGS, and MOORE, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Amy R. Sabrin, SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP, Washington, D.C., for
Appellant. Douglas N. Letter, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL DIVISION,
Washington, D.C., James B. Helmer, Jr., HELMER,

1

MARTINS & MORGAN CO., L.P.A., Cincinnati, Ohio, for Appellees. **ON BRIEF:** Amy R. Sabrin, Carl S. Rauh, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP, Washington, D.C., Daniel E. Izenson, KEATING, MUETHING & KLEKAMP, P.L.L., for Appellant. Douglas N. Letter, Alicia J. Bentley, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, Washington, D.C., James B. Helmer, Jr., Frederick M. Morgan, Jr., HELMER, MARTINS & MORGAN CO., L.P.A., Cincinnati, Ohio, for Appellees.

MOORE, J., delivered the opinion of the court, in which MERRITT, J., joined. BOGGS, J. (pp. 20-26), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. This action was brought under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, to recover damages for the loss of a helicopter that Defendant-Appellant Boeing Co. ("Boeing") had remanufactured or overhauled for military use. Boeing now raises the questions of law certified for interlocutory appeal by the district court, arguing that the district court erred in holding (1) that the High-Value Items Clause ("HVIC"), set forth in 48 C.F.R. ("FAR") § 52.246-24, and incorporated into the helicopter contract between the United States ("Government") and Boeing, does not operate as a defense to damages sought under the FCA and (2) that the Government may recover damages for the loss of the helicopter. We **AFFIRM** the judgment of the district court.

## I. BACKGROUND

In 1985 and 1989, the United States Army ("Army") awarded multiyear procurement contracts totaling approximately $2 billion to Boeing for the remanufacture of almost four hundred Boeing-manufactured CH-47A/B/C

including under the FCA.  Because the court does not so hold, I must respectfully dissent.

Chinook helicopters to the CH-47D configuration.  As part of these contracts, Boeing was required to inspect and to ensure the quality of all of the parts used for the remanufacture, including those items purchased from its chosen subcontractors.  The contracts provided warranty coverage for the helicopters from all defects in material and workmanship for the lesser of two-hundred flight hours or twenty-four months after acceptance.

On August 28, 1990, the Army accepted delivery of a remanufactured CH-47D helicopter ("Aircraft 89-0165").  The next day, Boeing submitted a claim for payment to the Government, in the form of a $4.1 million invoice for Aircraft 89-0165.  On January 11, 1991, after fifty-six flight hours, Aircraft 89-0165 suffered the failure of a defective flight-critical transmission gear[1] and crashed during a low-level contour flight over the Saudi Arabian desert as part of Operation Desert Shield.  Aircraft 89-0165 and its contents were totally destroyed at a loss of at least $10 million.  The Army replaced Aircraft 89-0165 with a new CH-47D helicopter that cost almost $13 million.

On May 22, 1995, Relator Brett Roby ("Roby") filed a *qui tam* action under seal pursuant to 31 U.S.C. § 3730(b) on behalf of himself and the Government, alleging that Boeing and its supplier, Speco Corp. ("Speco"), had violated the FCA by making false statements about the manufacture and sale of defective transmission gears to the Army via Boeing's remanufactured CH-47D helicopters.  Speco manufactured the gears that Boeing installed into the CH-47D helicopters before their delivery to the Army.  On April 30, 1997, the Government intervened and filed an Amended Complaint against Boeing, which was unsealed on May 1, 1997.

In its Answer, Boeing denied the allegations of FCA violations and raised a total of twelve affirmative defenses.  Specifically, Boeing claimed:  (1) that the HVIC, included by

---

[1] A "flight critical part" is necessary for flight; its failure could cause the loss of the aircraft.  J.A. at 1451 (Gray Dep.).

regulation in the helicopter contract, barred the damages sought under the FCA and (2) that consequential damages were not available under the FCA.

On December 21, 1998, the Government filed a motion for partial summary judgment, challenging Boeing's assertion of the HVIC as an affirmative defense. After hearing oral argument, the district court granted the motion. *United States ex rel. Roby v. Boeing Co.*, 73 F. Supp. 2d 897, 912 (S.D. Ohio 1999) ("*Roby* I"). On February 5, 1999, Boeing filed a cross-motion for partial summary judgment as to the measure of damages. After hearing oral argument, the district court granted Boeing's motion in part, with respect to the general issue of consequential damages, but denied the motion as it related to the Government's damages in this case. *United States ex rel. Roby v. Boeing Co.*, 79 F. Supp. 2d 877, 895-96 (S.D. Ohio 1999) ("*Roby* II").

On August 3, 2000, before trial, the parties reached a settlement under which Boeing made an immediate payment of $25 million. The settlement did not include the FCA claim arising from the Saudi crash; an additional payment of $15 million is contingent upon the outcome of this appeal. The district court accepted the settlement and certified for interlocutory appeal the following questions of law:

1. Whether the [Government] can recover damages under the [FCA] for loss of a helicopter resulting from the failure of a defective flight-critical component part; and
2. Whether the [HVIC] contained in [FAR] § 52.246-24 and incorporated in the Boeing CH-47D helicopter contract operates as a defense to damages sought under the [FCA] for the loss of or damage to a helicopter resulting from the failure of a defective component part.

J.A. at 214 (Order to Amend and Certify). On September 18, 2000, we granted Boeing's petition for permission to appeal. We have no question before us concerning whether and to what extent Boeing's conduct was fraudulent. Rather, the

From its history, it is clear that the DOD's self-insurance policy was intended to preclude liability for the loss of certain Government equipment – even when such loss was the result of non-managerial fraud – so that contractors would not purchase liability insurance, which otherwise would be costly and would be a cost passed on to the Government. The plain language of the HVIC at issue in the present case conforms to that purpose. However, the court's decision today does not; under it, contractors will have to insure against potential FCA liability for treble damages for the loss of high-value items resulting from actions that might be held to be fraudulent on the part of any personnel. Presumably, this cost will be passed on to the Government.

In sum, the court today holds that the HVIC does not apply in a situation wherein its plain terms and historical purpose seem to suggest it does apply – a contractor being held liable to reimburse the Government for the loss of a high-value item. Now, the Government argues that this case is not about recovering the amount lost when the helicopter was destroyed, but is instead about holding Boeing responsible for fraud. However, if the Government were really only concerned about fraud, it could seek the other penalties possible under the FCA or debar Boeing from participation in future Government contracts. Instead, the Government seeks trebled payment for the helicopter.

As explained above, if this court had held the HVIC applicable to Government actions for reimbursement under the FCA, it would not have been overriding or preempting the FCA. It would, instead, merely have been upholding the obvious coverage of a standard assumption of risk clause, under which the Government agreed not to exercise certain rights it would otherwise have in exchange for a benefit. This court would not have been holding that the FCA can not be relied upon by the Government; it would merely have been saying that the Government, in accordance with the express language and historical purpose of the HVIC, can not seek compensation for the loss of the helicopter under any theory,

As the district court in this case pointed out, around this time, the United States Commission on Government Procurement issued a report stating similarly, that defense contractors had long "[u]nderstood that the general practice of the government in military contracting was to accept the risk for loss or damage . . . ." *Roby I*, 73 F. Supp. 2d at 909. Still, the *Menasco* case shook the faith of Government contractors in the protection offered by the unwritten policy. In response, in 1971, the DOD issued *Defense Procurement Circular 86*, which, as the court notes, put in writing this limited liability. Majority Op. at 7 n.2.

The original 1971 version of the DOD's self-insurance policy stated that the clause did not apply "when the defects or deficiencies in such supplies . . . resulted from fraud or gross negligence as amounts to fraud, on the part of *any personnel of the Contractor*." DPC 86 at 4 (emphasis added). However, as the court notes, defense industry representatives warned that this would defeat the purpose of the clause, and when the clause was reissued in 1974, the phrase had been removed. Majority Op. at 9 n.4. It was replaced with a more limited exception, which – much like the one in the current HVIC – excluded only "willful misconduct or lack of good faith on the part of any of the Contractor's directors or officers, . . . managers, superintendents, or other equivalent representatives . . . ." ASPR 7-104.45 (July 1, 1974).

Importantly, the Government made this change expressly recognizing its effect. In a memorandum discussing proposed revisions to the HVIC, the Armed Services Procurement Regulations Committee, which promulgated the HVIC, explained that the removal of the original fraud provision would "eliminate contractor's [sic] responsibility for damage to Government Property resulting from defective items and caused by the fraud or gross negligence as amounts to fraud of any personnel of the contractor." J.A. at 652 (January 14, 1972). In 1984, the HVIC regulation relevant to this case became effective and provides substantially the same protection to military contractors providing high-value items. *See* 48 C.F.R. § 52.246-24.

question is whether the HVIC precludes liability under the FCA, assuming that liability would otherwise exist.

## II. ANALYSIS

In an interlocutory appeal, we review a district court's legal conclusions de novo. *Northwestern Ohio Adm'rs, Inc. v. Walcher & Fox, Inc.*, 270 F.3d 1018, 1023 (6th Cir. 2001).

### A. Mootness

We first consider sua sponte the jurisdictional question whether the parties' settlement of August 3, 2000, renders this case moot. Under Article III of the Constitution, our exercise of judicial power is limited to "actual cases or controversies." *Affholder, Inc. v. Preston Carroll Co.*, 866 F.2d 881, 885 (6th Cir. 1989) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)) (internal quotation marks omitted). "Settlement of a claim before a final adjudication moots the claim and deprives the federal judiciary of jurisdiction over the claim." *Id.* Agreements to limit recoverable damages, however, do not moot cases and therefore do not affect our jurisdiction. *Id.*

The parties' settlement in this case is essentially the same as the agreement to liquidate damages that was reached in *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), where a discharged air force employee sought civil damages from the former president. *Id.* at 733. Under the terms of the agreement, the employee accepted $142,000, with an additional amount of $28,000 contingent upon the Supreme Court's ruling that the former president was not entitled to absolute immunity. *Id.* at 744. Observing that "[t]he limited agreement between the parties left both petitioner and respondent with a considerable financial stake in the resolution of the question presented in this Court," the Court concluded, "Given respondents' continued active pursuit of monetary relief, this case remains definite and concrete, touching the legal relations of parties having adverse legal interests." *Id.* (quotation omitted).

In this case, Boeing has already paid the Government $25 million; it has agreed to pay an additional amount of $15

million contingent upon our rulings with respect to the scope of the FCA and the HVIC. Therefore, because the parties have "a considerable financial stake," the case is not moot, and we will proceed to the merits of this appeal.

## B.  The FCA and the HVIC

The history of the FCA dates back to 1863, when it was enacted "with the principal goal of stopping the massive frauds perpetrated by large [private] contractors during the Civil War." *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 781 (2000) (quotation omitted). The FCA has since become the primary means by which the Government combats and deters fraud. H.R. REP. NO. 99-660, at 18 (1986). As amended in 1986, the FCA provides for a civil penalty from $5,000 to $10,000 and treble damages when an individual knowingly acts to defraud the Government and does not "fully cooperate[] with any Government investigation of such violation." 31 U.S.C. § 3729(a). The Supreme Court understands the current version of FCA damages to be "essentially punitive in nature." *Vt. Agency*, 529 U.S. at 784 (explaining that the Court had "suggested that damages under an earlier version of the FCA were remedial rather than punitive [because] that version of the statute imposed only double damages and a civil penalty of $2,000 per claim" (citations omitted)).

Whereas the FCA allows the Government to recoup losses from fraud, the HVIC helps to manage the costs of liability insurance. Since 1984, the Federal Acquisition Regulations ("FAR") have prescribed the insertion of the HVIC in certain government contracts to limit the liability of contractors "for loss of or damage to property of the Government (including the supplies delivered under th[e] contract) that (1) occurs after Government acceptance of the supplies delivered under th[e] contract and (2) results from any defects or deficiencies

describe fraud. Therefore, the HVIC expressly exempts from protection losses due to fraud on the part of managerial personnel. The negative pregnant, therefore, would be that the HVIC does protect contractors from losses due to non-managerial fraud (which the parties have stipulated to be the extent of the fraud, if any, in the present case).

Second, the purpose of the clause supports the proposition that it was intended to provide protection no matter the legal theory. In order to explain why, however, I provide a slightly broader history of the HVIC.

As the district court in this case explained, the clause represents a long-standing Department of Defense (DOD) practice of self-insuring for damage to high-value items. *See Roby I*, 73 F. Supp. 2d at 908-09. At first it was just a practice, under which the DOD would not hold manufacturers liable for the loss of this type of equipment, regardless of whether the DOD found any fault, negligence, or breach of warranty to have occurred on the part of the manufacturer. *Id.* at 909. Then, in the 1960s, the landing gear on an airplane purchased by the United States military and resold to the Australian Navy failed, resulting in the destruction of the plane. The Australian government sued the manufacturer, seeking tort, contract, and products liability damages. *Ibid.* Referring to the long-standing practice of the Government self-insuring against the loss of military equipment, a California district court found that the United States Navy could have been estopped from pursuing any claim based on the loss of the aircraft, because the airplane industry was aware of and relied upon this practice. *See Australia v. Lockheed Aircraft Corp. & Menasco Mfg. Co.*, No. 69-1623-WPG (C.D. Cal. Jan. 10, 1972). Specifically, the court found that the self-insurance practice had two central purposes: (1) to encourage manufacturers not to obtain liability insurance, the cost of which would be passed on to the Government; and (2) to encourage the manufacturers to cooperate fully in investigating the cause of equipment failures. *Id.* at 2-3.

Government feels that it has been defrauded, it may debar Boeing from Government contracts. In short, the better reading of the HVIC is as an assumption of risk clause; the Government has contractually agreed to assume the risk of the loss of the helicopter, and while legal means remain open to the Government against Boeing (including that pursuant to the FCA), the Government can not seek recompense for the value of the equipment.[2]

There is support in both the wording and purpose of the HVIC for enforcing a natural reading of the contractual clause – that the Government has contracted away its right to seek property damages from suppliers of high-value items.

First, the wording of the HVIC supports the proposition that it was intended in the usual case to protect contractors from Government actions utilizing a fraud theory. Pursuant to it, contractors are not liable for any damages for the loss of a high-value item caused by a product defect, unless one of the few listed exceptions applies. As the court points out, one of those exceptions is for "willful misconduct or lack of good faith" on the part of managerial personnel. Majority Op. at 9 (citing FAR § 52.246-24(b)). Though not using the word "fraud," willful misconduct and a lack of good faith fairly

---

[2]Contrary to the court's contention, the argument that the Government can contract away part of its rights under the FCA is supported by the recent Fourth Circuit decision in *United States v. Bankers Insurance Co.*, 245 F.3d 315 (4th Cir. 2001). In that case, the Government was held to an arbitration agreement contained in a contract it had signed when the Government sought instead to bring an FCA action in court against the other party to the contract. The court tries to distinguish *Bankers Insurance* by noting that the contract at issue in that case permitted the Government the unfettered right to sue under the FCA after it engaged in the required arbitration. Majority Op. at 12-13. Nevertheless, the reasoning of *Bankers Insurance* still applies to the case at hand: "[T]he Government has no special right to ignore its contract responsibilities. The Government should comply with its contract obligations, and it cannot avoid them merely by invoking a statutory civil claim, such as one contemplated under the FCA." *Bankers Insurance*, 245 F.3d at 324.

---

in the supplies." FAR § 52.246-24(a).[2] The HVIC covers the loss of or damage to a high-value item, defined as "a contract end item that (a) has a high unit cost (normally exceeding $100,000 per unit) . . . and (b) is designated by the contracting officer as a high-value item." *Id.* § 46.802. Regarding such high-value items, the Government's stated policy is to "act as a self-insurer" and to "relieve contractors of contractual liability for loss of or damage to those items." *Id.* § 46.803. In short, the HVIC represents the Government's assumption of the risk that a high-value item such as Aircraft 89-0165 may be lost or damaged after acceptance as a result of a defect or deficiency in the item. It does not necessarily imply that the Government has self-insured for the damages that result from violations of federal law.

Boeing itself accepts the fact that, "[a]ssuming the government could prove a false claim, a contractor would remain liable for penalties and, if there be any, other appropriate FCA damages, notwithstanding the HVIC." Appellant's Br. at 31. However, relying on the text and history of the HVIC, Boeing argues that the HVIC prohibits the recovery of damages under any and all causes of action, when those damages result from the fraud of non-managerial personnel, meaning that there would be no appropriate FCA damages in this case. The issue before us is whether the HVIC's limitation of contractor liability extends to cases brought under the FCA. Specifically, we must decide whether the Government has agreed to limit damages that would otherwise be recoverable under the FCA.

In holding that the HVIC provides no defense to claims of FCA violations, the district court first noted that the FAR limit the application of the HVIC "to contractual remedies and not to claims premised under the [FCA]"; indeed, the HVIC and the FCA are silent with respect to each other.

---

[2]From 1971 to 1984, when the FAR became effective, Armed Services Procurement Regulation ("ASPR") 7-104.45 relieved contractors of such liability. *See* J.A. at 437 (Defense Procurement Circular 86 ("DPC 86") at 4), 485-86.

*Roby* I, 73 F. Supp. 2d at 910. Therefore, the district court declined to find them inconsistent. *Id.* Because FCA claims arise from the submission of a false or fraudulent claim, the district court concluded that the HVIC's limitation on contractual liability did not limit a contractor's liability under the FCA, finding no evidence in the record of any such intent on the Government's part. *Id.* at 910-11. Finally, the district court distinguished *United States v. United States Cartridge Co.*, 198 F.2d 456 (8th Cir. 1952), *cert. denied*, 345 U.S. 910 (1953), which held that a liability-limiting contract provision did limit the Government's FCA claims, *id.* at 465, on the ground that the contract was made in the emergency situation preceding World War II, making the case unique. *Roby* I, 73 F. Supp. 2d at 911-12.

We agree with the district court that the HVIC does not bar the Government from suing Boeing under the FCA to recover damages for Aircraft 89-0165. We look first to the language of the FCA, which holds a defendant liable for a civil penalty "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a). The allegedly fraudulent act in this case is Boeing's "false[] represent[ation] that the helicopters conformed to contract requirements and fail[ure] to disclose their faulty manufacture to the United States Government." J.A. at 87 (Am. Compl. at ¶ 3).[3] Because of this false claim, the Government sustained the loss of Aircraft 89-0165. Therefore, the Government argues that Boeing is liable under the FCA for treble damages as well as a civil penalty.

At this point, Boeing would direct us to the HVIC, which limits contractor liability for high-value items in fairly broad terms:

---

[3] We note that Boeing "vigorously denies" any knowing submission of a false claim in this case. Reply Br. at 4. However, we must assume such a submission to address whether the HVIC precludes FCA damages when incorporated as a contract provision.

is given a natural reading, it will conflict with the goals of the FCA. Majority Op. at 13.[1]

However, the court unnecessarily complicates the case. Contrary to the court's reading, the FCA and HVIC can easily be read in harmony. The HVIC does not overwrite or preempt the FCA by relieving contractors of liability for fraud. The FCA is still applicable to the contractors; the only difference made by the HVIC is that the Government has agreed that it will not hold the contractors liable under any theory for the value of the helicopter. Accordingly, the Government can sue the contractors under the FCA and seek a finding of liability for fraud; the Government merely can not seek damages for the value of the equipment. The other penalties under the FCA are still applicable, and if the

---

[1] I note that the court mentions in passing the district court's reading of the HVIC, which would alleviate any perceived tension between the HVIC and the FCA by limiting the HVIC's effect to only *contractual* remedies; in this reading, the HVIC would be completely inapplicable to the Government's *statutory* remedy under the FCA. Majority Op. at 7-8 (citing *Roby I*, 73 F. Supp. 2d at 910). To the extent that the court relies on this distinction, it appears incorrect. First, while the word *contractual* is used to modify the remedies limited by the HVIC in its enabling regulation, that modifier does not appear in the form contract language set out in the regulations, 48 C.F.R. § 52.246-24, or in the parties' contract (which incorporated the form language). Therefore, the clause as it appears in the parties' contract facially covers *all* remedies. Second, the word *contractual* as used in the enabling regulation for the HVIC is open to interpretation. In addition to the definition the district court gave it, that its protection only applies to contract remedies the Government might have against Boeing, the use of the word *contractual* might merely be shorthand for any remedies that come out of the relationship embodied in the contract. Indeed this broader reading is more in line with the history of the HVIC. For example, in the case that prompted the Government to turn its unwritten practice of self-insurance into a formal rule, *Australia v. Lockheed Aircraft Corp. & Menasco Mfg. Co.*, No. 69-1623-WPG (C.D. Cal. Jan. 10, 1972), the practice was discussed as a defense to contract, products liability, and negligence claims. Obviously neither negligence nor products liability claims are contract remedies in the narrow sense; they do not arise from a contract, just as a fraud claim does not. However, they can all arise out of a relationship between the parties that is based in a contract.

---

### DISSENT

---

BOGGS, Circuit Judge, dissenting. I respectfully dissent from the court's restrictive reading of the HVIC and its resultant holding that the Government can sue Boeing under the FCA to recover damages for Aircraft 89-0165.

As the court admits, the HVIC "limits contractor liability for high-value items in *fairly broad terms*." Majority Op. at 8 (emphasis added). The plain language of the HVIC states that, with limited exceptions that the parties agree are not applicable to the present case, "the Contractor shall not be liable for loss of or damage to property of the Government . . . that (1) occurs after Government acceptance of the supplies delivered under this contract and (2) results from any defects or deficiencies in the supplies." 48 C.F.R. § 52.246-24. Put most simply, this case is about the Government trying to do exactly what the plain and obvious wording of its contractual term says it will not do: recover from "the Contractor" for the "loss of or damage to property of the Government."

The court's holding – that the Government can seek under the FCA exactly what it has contracted through the HVIC not to – flows in large part from the inherent tension the court sees between the FCA and the HVIC. The court states well the history and purpose of each – the FCA was adopted to combat fraud perpetrated on the Government by its contractors, and the HVIC is included as a self-insurance provision in certain Government procurement contracts to limit the insurance that contractors must acquire (and the resultant costs those contractors pass on to the Government). Majority Op. at 6-7. The court then explains that if the HVIC

Except as provided in paragraphs (b) through (e) below, and notwithstanding any other provision of this contract, the Contractor shall not be liable for loss of or damage to property of the Government (including the supplies delivered under this contract) that (1) occurs after Government acceptance of the supplies delivered under this contract and (2) results from any defects or deficiencies in the supplies.

FAR § 52.246-24(a). The HVIC does not reference the FCA, but it does expressly refuse to limit a contractor's liability when "the Government's acceptance of [a high-value item] results from willful misconduct or lack of good faith on the part of any of the Contractor's managerial personnel." FAR § 52.246-24(b).[4] The parties have stipulated that this exception is not at issue in this case. Therefore, according to Boeing, the HVIC's limitation of liability for loss or damage

---

[4] This exception originally included "fraud or gross negligence as amounts to fraud[] on the part of any personnel of the Contractor." J.A. at 437 (ASPR 7-104.45(b)(ii) (1971)). The defense industry objected to this provision on the following grounds:

Today's exposure to possible infiltration by any number of dissident factions in our society serves to highlight the impossibility of any management to reasonably accept as an uninsured risk the results of any individual's actions regardless of the extreme nature of such acts.

Therefore, the introduction of this exception goes a long way toward negating the main purpose of DPC 86; that is, to remove from the Contractor the risk of potential liability for damage to Government property and eliminate from Government procurement the cost of Contractors' liability insurance against such liability for damage to Government property.

Unless the insurance exception is substantially modified and the exception regarding fraud of any personnel is removed, there is serious question whether DPC 86 implementation will have any real effect upon the cost of Contractor insurance included in the overall cost of the Government procurement program.

J.A. at 464-65 (Letter from Council of Defense and Space Industry Associations, to Captain E.C. Chapman, Chairman, ASPR Committee 4-5 (Aug. 12, 1971)). The Department of Defense eventually accepted the recommendation to delete the provision.

is absolute, precluding the Government from recovering any damages (as opposed to a civil penalty) under the FCA.

We cannot dispose of the FCA claim so easily. Although the loss of Aircraft 89-0165 occurred after Government acceptance and resulted from the defective Speco gear, it was actually caused by Boeing's initial misrepresentation that the helicopter conformed to contract requirements.[5] This misrepresentation, which triggered FCA liability, is the key to this case. Boeing argues from the "willful misconduct or lack of good faith" language in the managerial personnel provision, FAR § 52.246-24(b), that damages for FCA violations must be covered by the general limitation of liability. We do not agree. Were the HVIC a typical insurance policy, we would consider resolving the ambiguity in Boeing's favor. *Cf. North Bank v. Cincinnati Ins. Cos.*, 125 F.3d 983, 986-87 (6th Cir. 1997) (stating that Michigan law requires courts to construe ambiguous provisions and exclusionary clauses in insurance policies against the insurer). The aim of the HVIC, however, is to "reduc[e] Government procurement costs by limiting the contractor's risk." J.A. at 434 (DPC 86 at 1). The HVIC insures contractors only indirectly; it is, by its own terms, a self-insurance policy, which means that the Government is both insurer and insured. Because nothing in the HVIC suggests that its limitation of contractor liability covers statutory violations, we hold that the district court did not err in concluding that the HVIC does not provide a defense to damages sought under the FCA.

On one level, the dispute in this case is essentially the same as the one in *United States Cartridge Co.*, where the defendant operated a Government-owned ammunition plant during World War II. *United States Cartridge Co.*, 198 F.2d at 458. The Government alleged that the defendant had

---

[5]In other words, the loss would not have occurred as it did if Boeing had not warranted conformance, because the Government would have required the correction, repair, or replacement of the gear, which was under warranty. The HVIC itself emphasizes this obligation. FAR § 52.246-24(d)(1).

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price . . .”). In this case, the Government contracted for Aircraft 89-0165 to be remanufactured to specific standards. The helicopter as received by the Government did not meet those specifications. Therefore, the Government’s damages equal the difference between the market value of Aircraft 89-0165 as received (zero) and as promised. We do not presume to estimate the market value of a remanufactured helicopter. For our present purposes, we answer the question certified for interlocutory appeal in the affirmative — that is, the Government may recover damages under the FCA for the loss of a helicopter that results from the failure of a defective flight-critical component part. We note that these damages do not represent replacement costs.[9] Because the Government did not contract for a new helicopter, it may not recover the roughly $13 million value of the helicopter bought to replace the destroyed Aircraft 89-0165. However, it may recover the benefit of its bargain with Boeing, which would be the value that Aircraft 89-0165 would have had if it had been of the specified quality.

---

[9]The Federal Circuit has observed that the diminished-value test is “the normal measure of damages” in FCA cases but held that “[i]n the unusual case in which actual loss in value cannot be ascertained, the injured party may recover the replacement cost, but only if that cost is not clearly disproportionate to the probable loss in value caused by the defects in question.” *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1372-73 (Fed. Cir. 1998). “The cost of remedying defects is not regarded as disproportionate if the defects significantly affect the integrity of a structure being built. In that setting, the injured party is entitled to recover the cost of remedying the defects despite the fact that the cost may be very high.” *Id.* at 1372.

So instructed, we observe that if the actual loss in Aircraft 89-0165’s value could not be ascertained, then the Government would be entitled under *Commercial Contractors* to recover the very high cost of replacing the downed helicopter, because the defect concerned a flight- critical gear and significantly affected the structural integrity of the helicopter.

presented claims for payment that were false because it “fail[ed] to maintain a proper system of inspection and to produce the quality of ammunition called for by the contract.” *Id.* In its answer, the defendant denied any wrongdoing and argued that its liability was limited by contractual terms similar to the HVIC. *Id.* at 459-60. After a bench trial, the district court dismissed the case, noting that the limitation of liability was stated in “broad terms” and did not violate public policy. *Id.* at 460-63. The Eighth Circuit affirmed the dismissal. *Id.* at 465.

Not surprisingly, the parties disagree as to whether and how the *United States Cartridge Co.* decision should affect our disposition of this case. We think that the district court correctly distinguished the two cases. *See Roby* I, 73 F. Supp. 2d at 911-12 (emphasizing “the emergency situation” of war in *United States Cartridge Co.* and contrasting the “extensive governmental control of a prime contractor” in that case with the “limited governmental monitoring” in the case at bar). Moreover, we believe that the Government’s public policy argument in this case is stronger than it was in *United States Cartridge Co.*, where the Eighth Circuit concluded:

> If this contract were to be regarded as one creating the conventional relationship between the Government and a commercial corporate contractor not subject to Government supervision and control, for the supplying of goods or services, and if the provisions limiting liability were to be viewed merely as an attempt to relieve such a contractor from liability for its own fraud, the Government’s argument [that the limitation of liability was void] might perhaps be unanswerable.
>
> But this was not a conventional Government contract made under normal conditions; it was an unusual arrangement made to meet a crisis. . . . “The industrial units thus created are unique. * * * These plants embody a new and tripartite relationship among Government, labor, and management.”

*United States Cartridge Co.*, 198 F.2d at 464-65 (internal citation omitted).   The contract in this case was a conventional one for the remanufacture of helicopters almost entirely during peacetime, and Boeing was not subject to Government supervision or control.   These differences suggest that the limitation of liability in *United States Cartridge Co.* allocated risks in a way much more favorable to the defendant than does the HVIC.  In short, we do not read the HVIC as an agreement by the Government to assume the risk of damages to high-value items that it sustains because of FCA violations.

Boeing implores us to hold the Government to its contractual responsibilities and points us to the Fourth Circuit's recent decision in *United States v. Bankers Insurance Co.*, 245 F.3d 315 (4th Cir. 2001), where the question on appeal was "whether the existence of an FCA claim precludes arbitration of a contract dispute involving the Government."  *Id.* at 318.  The contract dispute concerned a federal agency and a private insurance company that had agreed to arbitrate any misunderstandings or disputes.  *Id.* at 317-18.   The Government contended that the Attorney General was not bound by the arbitration agreement because (1) he had not been a party to the agreement, *id.* at 319, and (2) arbitration would impair his exclusive authority to enforce the FCA.  *Id.* at 324.  Unpersuaded by these arguments, the Fourth Circuit ultimately required the Government to submit to nonbinding arbitration before litigating the FCA claim.  *Id.* at 324-25.

According to Boeing, the holding in *Bankers Insurance* that the Government must satisfy its contractual obligations supports the proposition in this case that the Government may comply with the HVIC only by refraining from seeking damages under the FCA.  That the Government is bound by the contracts that its authorized officials sign is incontrovertible.  However, we cannot as readily agree with the inference that Boeing draws from *Bankers Insurance* for the resolution of this case.  The Fourth Circuit recognized that FCA claims are "premised on a unique statutory right" and

Under *Compton*, the market value of Aircraft 89-0165 as delivered was zero.  Boeing, of course, would disagree, and we are aware of the fact that the Army did get fifty-six hours of flight time from the helicopter, when the warranty was good for two-hundred flight hours.   However, as we concluded in *Compton*:

> [A] setoff based on value purportedly received would create a perverse incentive system in which government contractors could endanger the lives of American soldiers by providing substandard materiel, and the Army would be deterred from correcting the danger because it would be forced to bear the cost of any use it received from the substandard goods before their defects were discovered.

*Compton*, 142 F.3d at 305 n.8.  We believe that this policy argument, which was compelling with respect to untested jeep brake-shoe kits, *id.* at 297-98, has even more force in the context of this case.

*Compton* is not as helpful in determining the market value of Aircraft 89-0165 as promised.  In *Compton*, we held that the Government could recover the contract price because damages were the same whether we applied the diminished-value test, as the defendant urged, or the Uniform Commercial Code's rejection provision.   *Id.* at 305.  However, contrary to Boeing's reading of the case, *Compton* does not necessarily signify that the recovery of damages in FCA cases is "limited to the contract price originally paid." Reply Br. at 26.  Although the Government apparently did not claim that its full or actual damages were more than the contract price in *Compton*, it does so in this case.

Boeing characterizes the Government's claim as one for replacement costs, which it argues are consequential damages and thus unrecoverable under the FCA.  We think that this characterization confuses the issue.  Under the diminished-value test that Boeing itself favors, actual damages depend on "market value."  *Bornstein*, 423 U.S. at 317 n.13.  Boeing conflates market value and contract price, but the concepts are clearly distinct.  *Cf.* U.C.C. § 2-713 (2001) ("[T]he measure

That the contract in this case was for the remanufacture rather than the sale of a helicopter gives us some pause, but ultimately does not affect the issue before us.[8] We will therefore frame the following discussion in terms of the market value of remanufactured helicopters.

---

supplied these tubes sent tubes that were falsely marked as meeting the Government's specifications. *Id.* The contractor then incorporated the falsely marked tubes into the radio kits and shipped them to the Government. *Id.* The contractor's invoices were thus false because they "included claims for payment for the falsely marked tubes that had been supplied" by the subcontractor. *Id.* After recovering damages for the tubes from the contractor, presumably by settlement, the Government brought an FCA action against the subcontractor. *Id.* at 307-08. In holding "that the Government's damages should be doubled [as the FCA then provided] before any compensatory payments are deducted," *id.* at 314, the *Bornstein* Court stated that those damages were "equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality." *Id.* at 317 n.13.

We recount these facts in detail because the similarity between *Bornstein* and this case might prompt the all-too-easy substitution of "gear" for "tubes" in the equation quoted above. In both cases, the claim for payment was false because of a defective part that a subcontractor had supplied. However, as the district court correctly noted, "*Bornstein* was concerned only with the issue of damages and penalties against a subcontractor who causes the prime contractor to submit false claims." *Roby* II, 79 F. Supp. 2d at 893 n.47. The defendant in this FCA action, of course, is Boeing, not Speco. We cannot know why the Government settled with the contractor in *Bornstein* for only the cost of the falsely marked tubes when it had contracted and paid for radio kits — perhaps the tubes did not affect the reliability of the radios. *See Bornstein*, 423 U.S. at 318-20 (Rehnquist, J., concurring in part and dissenting in part) (describing the subcontractor's scheme). In this case, however, the Speco gear was not simply of lesser quality than specified; it was a defective flight-critical part, which made the loss of Aircraft 89-0165 inevitable.

[8]Again, we note that the question certified for appeal is "[w]hether the [Government] can recover damages under the [FCA] for loss of a helicopter resulting from the failure of a defective flight-critical component part." J.A. at 214. The answer to this question does not depend on whether the underlying contract was for remanufacture or sale.

---

explicitly noted that "the statutory authority of the Attorney General [to enforce the FCA would] not [be] compromised by" making the Government honor its previous agreement to arbitrate. *Bankers Ins.*, 245 F.3d at 325. In other words, the contract in *Bankers Insurance* merely deferred the litigation of the FCA claim until the nonbinding arbitration process had been completed.

In this case, however, Boeing's interpretation of the HVIC would absolutely foreclose the Government from recouping anything more than a $10,000 civil penalty for damages sustained because of a false claim for a high-value item, when the damages sustained could be far greater than the general $100,000 threshold for such items. Given Congress's explicit recognition while amending the FCA "that a large number of fraud cases and many of the larger-dollar cases arise out of Department of Defense contracts," H.R. REP. NO. 99-660, at 20,[6] it strikes us as incongruous that the HVIC would relieve contractors for high-value items from the FCA's damages provision. After all, the motivating purpose of the FCA is to combat and to deter fraud, which would not be served in the context of defense contracts by the civil penalty alone.

In its brief, Boeing expounds at length on the negative implications, both fiscal and otherwise, of holding military contractors liable under the FCA for damages to high-value items. We agree with the Government and Roby that we should leave any revision of the FCA or the HVIC to Congress. In the case before us, Boeing was contractually required to ensure the quality of the parts used for the remanufacture of the Army's helicopters; its failure to do so

[6]*See also* S. REP. NO. 99-345, at 2-3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5267 ("In 1985, the Department of Defense Inspector General, Joseph Sherick, testified that 45 of the 100 largest defense contractors, including 9 of the top 10, were under investigation for multiple fraud offenses. Additionally, the Justice Department has reported that in the last year, four of the largest defense contractors, General Electric, GTE, Rockwell and Gould, have been convicted of criminal offenses while another, General Dynamics, has been indicted and awaits trial." (citations omitted)).

resulted in the Government's acceptance and use of a helicopter that was not flight-ready and the subsequent loss of the helicopter. The HVIC does not foreclose the FCA as a means for the Government to recover damages for the loss of Aircraft 89-0165.

## C. FCA Damages

The crux of this case is the appropriate measure of damages under the FCA, which simply provides for "3 times the amount of damages which the Government sustains because of the act of th[e] person" who submitted the false or fraudulent claim. 31 U.S.C. § 3729(a). We have previously observed that FCA damages "typically are liberally calculated to ensure that they 'afford the government complete indemnity for the injuries done it.'" *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 304 (6th Cir. 1998) (quoting *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 549 (1943)). "[T]he government is entitled to full damages where it proves it received no value at all." *Id.*

In *Marcus*, the Supreme Court indicated that "restitution to the government of money taken from it by fraud" was the motivating purpose of the FCA; therefore, "the device of [then-] double damages plus a specific sum was chosen to make sure that the government would be made completely whole." *Marcus*, 317 U.S. at 551-52. Three decades later, in *United States v. Bornstein*, 423 U.S. 303 (1976), the Supreme Court understood the baseline to be "the Government's actual damages," measured as "equal to the difference between the market value of the [goods] it received and retained and the market value that the [goods] would have had if they had been of the specified quality." *Id.* at 316 & n.13. The *Bornstein* Court favored this formula because it "maximizes the deterrent impact of the [then-] double-damages provision and fixes the relative rights and liabilities of the respective parties with maximum precision." *Id.* at 317.

In this case, the district court held that the Government could recover damages under the FCA that were "the direct, proximate, and foreseeable result of the claims submitted by"

Boeing for Aircraft 89-0165; Boeing had argued that its liability at most was limited to "the price of a fully-conforming transmission gear." *Roby* II, 79 F. Supp. 2d at 895. On appeal, Boeing continues to maintain that "the proper measure of direct FCA damages is the amount wrongfully paid on the claim," Reply Br. at 23, or the value of the defective Speco gear. However, Boeing now concedes that damages under the FCA could equal — but never exceed — the amount of the claim, which in this case would be the approximately $4.1 million value of Boeing's contract to remanufacture Aircraft 89-0165.

Negotiation strategy aside, we are at a complete loss as to how Boeing can understand "the amount wrongfully paid" to be limited to "the portion of the contract price allocated to the defective gear." Reply Br. at 21. According to our reading of the contract and the subsequent invoice, Boeing billed the Government for the remanufactured helicopters as units, not as assemblages of assorted parts. *Cf. Bornstein*, 423 U.S. at 307 (invoices for radio kits that contained falsely marked electron tubes "included claims for payment for the falsely marked tubes"). The fact that every component but one conformed to contract requirements is not legally significant when the defective gear was "flight critical" and thus necessary for flight. Because the Speco gear was defective, Aircraft 89-0165 was defective, making Boeing's entire claim for payment false for the purposes of the FCA.

This understanding of Boeing's FCA violation informs our analysis of how to calculate damages under the FCA. Under the "diminished value" or "benefit of the bargain" test, which Boeing cites as controlling, we subtract the market value of what the Government received from what it was promised.[7]

---

[7] *See generally* JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 3.01[D][1], at 3-34 to 3-35 (2d ed. Supp. 2002). The facts of *Bornstein*, where the Supreme Court articulated this rule, are similar to those of this case and deserve some attention. *Bornstein* involved a Government contract for radio kits, which were to contain electron tubes of a certain quality. *Bornstein*, 423 U.S. at 307. The subcontractor who